09-3034-cv
Hazi v. Bank Melli Iran

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

------------

August Term, 2009

(Argued: February 17, 2010          Decided: June 15, 2010)

Docket No. 09-3034-cv

- - - - - - - - - - - - - - - - - - - - - - - X

SUSAN WEINSTEIN, individually as Co-Administrator of the Estate
of IRA WILLIAM WEINSTEIN, and as Natural Guardian of plaintiff
DAVID WEINSTEIN, JEFFREY A. MILLER, as Co-Administrator of the
Estate of IRA WILLIAM WEINSTEIN, JOSEPH WEINSTEIN, JENNIFER
WEINSTEIN, HAZI & DAVID WEINSTEIN,
JENNIFER WEINSTEIN HAZI,

Plaintiffs-Appellees,

BANK OF NEW YORK,

Plaintiff

- against -

ISLAMIC REPUBLIC OF IRAN, IRANIAN MINISTRY OF INFORMATION AND
SECURITY, AYATOLLAH ALI HOSEINI KHAMENEI, ALI AKBAR HASHEMI-
RAFSANJANI, ALI FALLAHIAN-KHUZESTANI,

Defendants,

BANK MELLI IRAN NEW YORK REPRESENTATIVE OFFICE,

Respondent-Appellant,

BANK SADERAT IRAN, NEW YORK REPRESENTATIVE OFFICE,
BANK SEPAH IRAN, NEW YORK REPRESENTATIVE OFFICE

Respondents,

- - - - - - - - - - - - - - - - - - - - - - - X

Before: KEARSE and HALL, Circuit Judges, and RAKOFF, District Judge.*

Appeal by respondent Bank Melli Iran from a ruling of the United States District Court for the Eastern District of New York (Leonard D. Wexler, Judge) granting plaintiff's motion for appointment of receiver to attach respondent's property in satisfaction of a prior judgment.

Affirmed.

LAINA C. LOPEZ, Berliner, Corcoran & Rowe, LLP, Washington, DC (Thomas G. Corcoran, Jr., Berliner, Corcoran & Rowe, LLP, Washington, DC, John N. Romans, Law Office of John N. Romans, Mamaroneck, NY, on the brief), for Respondent-Appellant.

ROBERT J. TOLCHIN, Jaroslawicz & Jaros, New York, NY, for Plaintiff-Appellee.

RAKOFF, District Judge:

On February 25, 1996, Ira Weinstein, a United States citizen and resident of New York, was severely injured during a suicide bombing in Jerusalem organized by the terrorist organization Hamas. On April 13, 1996, Weinstein died from those injuries. See Weinstein v. Islamic Rep. of Iran, 184 F. Supp. 2d 13, 16-17 (D.D.C. 2002). On October 27, 2000, his widow, another administrator of his estate, and his children brought suit for wrongful death and other torts against the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security, and three Iranian officials, alleging that these defendants had

---

*The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

provided substantial monetary support for Hamas's terrorist attacks. See id. at 21-22. After defendants failed to appear, the district court determined that the plaintiffs had established their "claim or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e), and entered default judgment for plaintiffs in the amount of approximately $183,200,000. See id. at 16, 22-26.

Plaintiffs registered the judgment in the U.S. District Court for the Eastern District of New York on October 8, 2002, and served an information subpoena on Bank of New York that eventually led to the identification of respondent Bank Melli Iran ("Bank Melli") as a possible instrumentality of the Iranian state. See Weinstein v. Islamic Rep. of Iran, 299 F. Supp. 2d 63, 64-65 (E.D.N.Y. 2004). The district court found it unnecessary to determine whether Bank Belli was an "agency or instrumentality" for purposes of the TRIA because the court determined that Bank Melli's accounts at the Bank of New York were unattachable. Id. at 74-76. However, on October 31, 2007, one of the plaintiff-judgment creditors, Jennifer Weinstein Hazi ("Hazi"), filed a motion in the Eastern District proceeding, seeking appointment of a receiver (pursuant to Rule 69 of the Federal Rules of Civil Procedure and Section 5228(a) of the New York Civil Practice Law and Rules), to sell real property owned by respondent Bank Melli in Forest Hills, Queens, which plaintiff

sought to attach and sell in partial satisfaction of the judgment against the defendants. Hazi argued that the Forest Hills property was now subject to attachment pursuant to the Terrorism Risk Insurance Act of 2002 ("TRIA"), § 201(a), Pub. L. No. 107-297, 116 Stat. 2322, 2337, codified at 28 U.S.C. § 1610 note, because on October 25, 2007, Bank Melli had been designated by the United States Department of Treasury, Office of Foreign Assets Control ("OFAC") as a "proliferat[or] of weapons of mass destruction," and its assets had been frozen. See Executive Order 13,382, 70 Fed. Reg. 38,567 (June 28, 2005).[1]

On February 21, 2008, Bank Melli moved to dismiss the proceeding against it and to stay the appointment of a receiver pending resolution of its motion to dismiss. In its motion to dismiss, Bank Melli argued, inter alia, that attachment and sale of the Forest Hills property would violate the Treaty of Amity between the United States and Iran, that attachment and sale would constitute a taking not for a public purpose and without just compensation in violation of the Takings Clause of both the Fifth Amendment of the United States Constitution and Article

---

[1] Executive Order 13,382 was issued by the President pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, 1702, and provided that all property and interests in property in the United States of persons and entities listed in the order or subsequently listed "are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." Exec. Order 13,382, 70 Fed. Reg. 38,567 (June 28, 2005). Bank Melli was added to the list on October 25, 2007.

-4-

IV.2 of the Treaty of Amity, and that the blocking of its assets violated the so-called "Algiers Accords" and thus attachment and sale would constitute a further violation of the Accords. On June 5, 2009, after receiving submissions from both Hazi and Bank Melli,[2] the district court (Wexler, Judge) denied Bank Melli's motion to dismiss and granted Hazi's motion to appoint a receiver, but stayed the proceedings pending this appeal.

DISCUSSION

A.   JURISDICTION

On this appeal, Bank Melli argues for the first time that the district court lacked ancillary jurisdiction to entertain Hazi's motion to appoint a receiver. According to Bank Melli, Hazi's motion was not simply a proceeding to collect on a debtor's assets, but rather "an independent controversy with a new party in an effort to shift liability," Epperson v. Entm't Express, Inc., 242 F.3d 100, 106 (2d Cir. 2001); see also Peacock v. Thomas, 516 U.S. 349, 357 (1996), for which TRIA § 201(a) did not provide an independent source of jurisdiction. Although not raised below, subject matter jurisdiction may be raised at any point, Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 576 (2004); Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d

---

[2] Although the district court also invited the United States to file its own submission to address the issues in the case, the Government declined to do so.

240, 250 (2d Cir. 2008), and so the Court must address this threshold matter.[3]

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq., provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign state defendants, and therefore for a court to exercise subject matter jurisdiction over a defendant the action must fall within one of the FSIA's exceptions to foreign sovereign immunity. See, e.g., Saudi Arabia v. Nelson, 507 U.S. 349, 351 (1993); Argentine Rep. v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-35 (1989); Verlinden B.V. v. Cent. Bank of Nig., 461 U.S. 480, 493 (1983). In the underlying action that gave rise to the judgment on which plaintiff now seeks to collect, the district court exercised subject matter jurisdiction over Iran and the other defendants under 28 U.S.C. § 1605(a)(7), which abrogates immunity for those foreign states officially designated as state sponsors of terrorism by the Department of State where the foreign state commits a terrorist act or provides material support for the commission of a terrorist act and the act results in the death or

---

[3] The district court did, however, cite for other purposes to a lower court decision that also considered the jurisdiction issue. See Weininger v. Castro, 462 F. Supp. 2d 457, 490 (S.D.N.Y. 2006) (holding that the TRIA "provides [an] independent basis of subject matter jurisdiction in this enforcement proceeding against these [foreign sovereign] entities").

personal injury of a United States citizen.[4]  See Weinstein, 184 F. Supp. 2d at 20-21.  When such an exception applies, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ."  28 U.S.C. § 1606; see also Verlinden, 461 U.S. at 488-89.

Bank Melli was not itself a defendant in the underlying action.  However, the FSIA has a separate section, Section 1609, that provides that where a valid judgment has been entered against a foreign sovereign, property of that foreign state is immune from attachment and execution except as provided in the subsequent sections, Sections 1610 and 1611.  28 U.S.C. § 1609.  Section 201(a) of the TRIA, codified as a note to Section 1610 of the FSIA, provides as follows:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7)], the blocked assets of that terrorist party (including the blocked assets of any agency or

---

[4] In 2008, Congress repealed § 1605(a)(7) and created a new section specifically devoted to the terrorism exception to the jurisdictional immunity of a foreign state.  See Pub. L. 110-181, Div. A, § 1803, Jan. 28, 2008, 122 Stat. 341 (repealing 28 U.S.C. § 1605(a)(7) and creating 28 U.S.C. § 1605A).  To the extent relevant to this case, § 1605A provides for the same exceptions to foreign sovereign immunity as the repealed section.

instrumentality of that terrorist party) shall be subject to execution or attachment in the aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), 116 Stat. at 2337 (emphasis supplied).

The parties do not dispute that each of the elements of Section 201(a) is satisfied here. Iran has been designated a terrorist party pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), beginning January 19, 1984, see Weinstein, 184 F. Supp. 2d at 20, and therefore is a "terrorist party" as defined by TRIA § 201(d)(4), 116 Stat. at 2340. The district court in the underlying action found jurisdiction under 28 U.S.C. § 1605(a)(7), and thus Iran was not immune from jurisdiction in the original proceeding. See id. at 20-21. Bank Melli's assets were "blocked" as of October 2007, designated as such pursuant to Executive Order 13,382 and 50 U.S.C. §§ 1701, 1702. Finally, Bank Melli concedes that it is an instrumentality of Iran.

Bank Melli contends, however, that the above-quoted language of the TRIA does not provide an independent basis for jurisdiction over an instrumentality of a sovereign state when the instrumentality was not itself a party to the underlying tort action that gave rise to judgment on which plaintiff now seeks to

recover. Rather, Bank Melli argues, Section 201(a) of the TRIA simply provides an additional ground for abrogating immunity from attachment for a party that has been the subject of a valid judgment, but does not provide jurisdiction for a court to permit attachment against a party that was not itself the subject of the underlying judgment.

Although novel,[5] Bank Melli's argument is belied by the plain language of Section 201(a), as well as by its history and purpose. Section 201(a) clearly states that "in every case in which a person has obtained a judgment against a terrorist party . . ., the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment . . . ." TRIA § 201(a), 116 Stat. at 2337 (emphasis supplied). Under Bank Melli's interpretation, the parenthetical language in Section 201(a) of the TRIA that permits attachment of funds from agencies and instrumentalities would be rendered superfluous, since the agency or instrumentality would itself have been a "terrorist party" against which the underlying judgment had been obtained. See, e.g., Corley v. United States, 129 S. Ct. 1558, 1566 (2009)

---

[5] To date, no appellate court has addressed this issue, although several district courts have found that the TRIA grants subject matter jurisdiction for execution and attachment proceedings over parties against whom there exist underlying judgments. See, e.g., Weininger, 462 F. Supp. 2d at 477-89; Rubin v. Islamic Rep. of Iran, 456 F. Supp. 2d 228 (D. Mass. 2006).

-9-

("'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004)). Instead, however, the statute clearly differentiates between the party that is the subject of the underlying judgment itself, which can be any terrorist party (here, Iran), and parties whose blocked assets are subject to execution or attachment, which can include not only the terrorist party but also "any agency or instrumentality of that terrorist party." If this did not constitute an independent grant of jurisdiction over the agencies and instrumentalities, the parenthetical would be a nullity.

Although Bank Melli points out that Section 201(a) of the TRIA has been codified as a note to Section 1610 rather than in the sections of the FSIA more directly addressed to exceptions to jurisdictional immunity, the plain language of the statute cannot be overcome by its placement in the statutory scheme. See Padilla v. Rumsfeld, 352 F.3d 695, 721 (2d Cir. 2003) ("No accepted canon of statutory interpretation permits 'placement' to trump text, especially where, as here, the text is clear and our reading of it is fully supported by the legislative history."), rev'd on other grounds by Rumsfeld v. Padilla, 542 U.S. 426 (2004); see also Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2336 (2008) (noting that a statutory

-10-

provision's placement in a particular section "cannot substitute for the operative text of the statute").  This is even more clearly true in this case where the operative language begins with the phrase "[n]otwithstanding any other provision of law," thus making plain that the force of the section extends everywhere.

Any inquiry into the meaning of a statute generally "ceases 'if the statutory language is unambiguous and the statutory scheme is coherent and consistent.'"  Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (other internal quotation marks omitted)); see also Universal Church v. Geltzer, 463 F.3d 218, 223 (2d Cir. 2006).  But even if, contrary to fact, there were an ambiguity here, it would be resolved in plaintiff's favor by the legislative history.  According to Senator Harkin, one of TRIA's sponsors:

> The purpose of title II is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties. . . . Title II operates to strip a terrorist state of its immunity from execution or attachment in aid of execution by making the blocked assets of that terrorist state, including the blocked assets of any of its agencies or instrumentalities,

-11-

available for attachment and/or execution of a judgment issued against that terrorist state. Thus, for purposes of enforcing a judgment against a terrorist state, title II does not recognize any juridical distinction between a terrorist state and its agencies or instrumentalities.

148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002) (statement of Sen. Harkin). Senator Harkin further stated that TRIA "establishes once and for all, that such judgments are to be enforced against any assets available in the U.S., and that the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act." Id.

Accordingly, we find it clear beyond cavil that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment.

B.   CONSTITUTIONALITY OF TRIA

The underlying judgment which plaintiff seeks to satisfy was obtained in February 2002, but the TRIA was not enacted until November 2002 and Bank Melli was not designated a "proliferat[or] of weapons of mass destruction" until 2007. In another argument raised for the first time on appeal, Bank Melli argues that the

-12-

TRIA, as here applied, is unconstitutional because it "mandates the reopening of a final judgment in violation of the separation of powers doctrine of Article III of the U.S. Constitution." Thus, to avoid any constitutional problem, Bank Melli urges this Court to read the TRIA as applying, prospectively, only to judgments rendered final after the TRIA's enactment, and thus not to apply here.

Although plaintiff contends, with some force, that the constitutional challenge has been waived for failure to raise it below, a claim that a legislative enactment intrudes on the courts' powers is the kind of claim that appropriately may be considered here, even if for the first time. See, e.g., Freytag v. Comm'r, 501 U.S. 868, 879 (1991) (rejecting waiver and addressing constitutional challenge because of "the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers") (internal quotation marks omitted).

Bank Melli's constitutional challenge is largely derived from Plaut v. Spendthrift Farm, Inc., 514 U.S. 211 (1995), in which the Supreme Court held that a section of the Securities Exchange Act of 1934 violated separation of powers because it required federal courts retroactively to reopen final money judgments that had been dismissed as barred under the statute of limitations. See id. at 219. "[R]etroactive legislation [that]

-13-

requires its own application in a case already finally adjudicated . . . does no more and no less than 'reverse a determination once made, in a particular case' [and thus] exceeds the powers of Congress." Id. at 225 (quoting The Federalist No. 81, at 545 (J. Cooke, ed., 1961)).

Here, however, no such revision of the 2002 judgment is effectuated by the attachment of Bank Melli's property pursuant to the TRIA. Indeed, the judgment itself is unaffected. What the TRIA did, instead, was to override the Supreme Court's reading in First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 627-28 (1983) ("Bancec"), that "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." Id. at 627. This presumption related to enforceability of judgments against state instrumentalities, but it had not nothing to do with the rendering of the judgment itself. Moreover, even under Bancec, the presumption could be overcome. Id. at 629. The effect of the TRIA, therefore, was simply to render a judgment more readily enforceable against a related third party. The judgment itself was in no way tampered with, and separation of powers was thus in no way offended.[6]

---

[6] It should be noted that Hazi seeks attachment of property in partial satisfaction only of the portion of the underlying judgment that awarded compensatory damages in her favor. See Rein v. Socialist People's Libyan Arab Jamahiriya, 162 F.3d 748, 762 (2d Cir. 1998) ("Where a retroactive law is civil rather than

-14-

Bank Melli also argues that the delegation of authority to the Treasury Department to determine which entities' assets would be "blocked" is, as applied here, tantamount to an unconstitutional vesting of "review of the decisions of Article III courts in officials of the Executive Branch." Plaut, 514 U.S. at 218; see Hayburn's Case, 2 U.S. (2 Dall.) 409 (1792). Here, however, it is clear that no official from the Executive Branch stands in direct review of the district court's decision regarding execution and attachment of assets pursuant to the TRIA. OFAC simply made a factual determination that Bank Melli was a proliferator of weapons of mass destruction, pursuant to which Bank Melli's assets were "blocked." In so doing, OFAC did not in any way review or alter the district court's original entry of the default judgment.

Nor does the district court's reliance on OFAC's determination for its exercise of subject matter jurisdiction run afoul of separation of powers. In Jones v. United States, 137 U.S. 202 (1890), the Supreme Court held that the district court had subject matter jurisdiction over a murder trial where the crime occurred on an island that the State Department had deemed

---

criminal, it is only the imposition of punitive damages that might, in particular circumstances, raise a constitutional problem."). Of the total judgment of approximately $183,200,000, approximately $33,200,000 was compensatory damages, of which $5,000,000 was allocated to Hazi. Weinstein, 184 F. Supp. 2d at 22-25.

was "appertaining to the United States."  Id. at 224.  In that case, the exercise of subject matter jurisdiction based on an Executive Branch determination did not exceed the bounds of Article III.  Similarly, in Matimak Trading Co. v. Khalily, 118 F.3d 76, 83-84 (2d Cir. 1997), overruled in part on other grounds by JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S. 88 (2002), this Court found that alienage jurisdiction could depend on whether the Executive Branch had deemed a given foreign entity a "state," and because the foreign entity in question had not been recognized as a "state," jurisdiction was deemed lacking.

It is true that, in Rein, 162 F.3d at 763, this Court, in dicta, raised the question of whether after the passage of the FSIA, designation of a foreign state as a sponsor of terrorism by a branch other than Congress raised a potential issue of separation of powers.  Specifically, in Rein, we rejected Libya's argument that the State Department's designation of Libya as a state sponsor of terrorism violated separation of powers, since Libya had already been designated as such when section 1605(a)(7) was added to the FSIA; but we queried whether a different "issue of delegation might be presented if another foreign sovereign -- one not identified as a state sponsor of terrorism when § 1605(a)(7) was passed -- was placed on the relevant list by the State Department and, on being sued in federal court, interposed

-16-

the defense that Libya now raises." 162 F.3d at 764; see also Miller v. FCC, 66 F.3d 1140, 1144 (11th Cir. 1995) (noting that Congress cannot delegate the power of any federal agency to "oust state courts and federal district courts of subject matter jurisdiction"); United States v. Mitchell, 18 F.3d 1355, 1360 n.7 (7th Cir. 1994) (raising doubts about whether Congress could delegate its control over federal court jurisdiction to any agency or commission).

In effect, Bank Melli now raises, albeit obliquely, the kind of issue left unaddressed in Rein. Like Libya, Iran was already deemed a state sponsor of terrorism when the relevant provision of the FSIA was applied to abrogate foreign sovereign immunity in the district court. However, here, the district court's jurisdiction over a proceeding to attach Bank Melli's assets depended, at least in part, on OFAC's subsequent determination that Bank Melli was a proliferator of weapons of mass destruction. Reaching only the instant variation on the issue alluded to in the dicta in Rein, we hold that Congress, by virtue of providing subject matter jurisdiction over execution and attachment proceedings based in part on OFAC's determination of what assets are blocked, has not unconstitutionally delegated its authority to the Executive Branch.

The TRIA provides jurisdiction for execution and attachment proceedings to satisfy a judgment for which there was original

-17-

jurisdiction under the FSIA (which is not challenged here) if certain statutory elements are satisfied. The fact that satisfaction of one of those statutory elements -- that Bank Melli's assets were blocked -- was based on the factual determination by a coordinate branch that Bank Melli supported terrorist activity is not, on its own, a delegation of Congress's authority over the courts' subject matter jurisdiction that exceeds the boundaries of Article III. The TRIA only delegates to the Executive the authority to make a factual finding upon which jurisdiction turns in part. See, e.g., Owens v. Rep. of the Sudan, 531 F.3d 884, 891 (D.C. Cir. 2008) (rejecting Sudan's argument that the FSIA unconstitutionally delegated subject matter jurisdiction to Executive Branch because the FSIA only granted "authority to make a factfinding upon which jurisdiction partially rests"). That factfinding, moreover, is one peculiarly within the expertise of the Executive, a fact Congress itself implicitly recognized in creating the TRIA.

In short, none of Bank Melli's belatedly-raised constitutional arguments persuades the Court that there has been any defect in the application of the TRIA in this case.

C.   TRIA & TREATY OF AMITY

We next turn to the arguments that Bank Melli did raise in the district court, the first of which concerns the Treaty of Amity (the "Treaty") that the United States and Iran (then

-18-

governed by the Shah) signed in 1955, which took effect in 1957 and still remains in place. Treaty of Amity, Economic Relations, and Consular Rights, U.S.-Iran, Aug. 15, 1955, 8 U.S.T. 899. Article III.1 of the Treaty provides that "[c]ompanies constituted under the applicable laws of either High Contracting Party shall have their juridical status recognized within the territories of the other High Contracting Party." Id., art. III.1. Article IV.2 adds that "[p]roperty of nationals and companies of either High Contracting Party, including interest in property, shall receive the most constant protection and security within the territories of the other High Contracting Party, in no case less than that required by international law." Id., art. IV.2.

Bank Melli asserts that these provisions, read together, require that Iranian companies be treated as distinct and independent entities from their sovereign. But this is not correct. As the district court noted, the key provision, Article III.1., is "substantively identical" to a provision in a number of Friendship, Commerce, and Navigation ("FCN") treaties negotiated by the U.S. following World War II. In Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176 (1982), the Supreme Court held that these provisions are designed, not to give separate juridical status to instrumentalities of the sovereign entity, but simply "to give corporations of each signatory legal

-19-

status in the territory of the other party, and to allow them to conduct business in the other country on a comparable basis with domestic firms." Id. at 185-86.

Bank Melli argues that Sumitomo only addressed the language in the provision of the U.S.-Japan FCN Treaty that a company "constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof," but did not address the rest of the provision, "and shall have their juridical status recognized within the territories of the other Party." While it is true that the Court focused its analysis on the phrase "shall be deemed companies thereof," it went on to explain that the intent behind the FCN treaties as a whole was simply to grant legal status to corporations of each of the signatory countries in the territory of the other, thus putting the foreign corporations on equal footing with domestic corporations. 457 U.S. at 185-86. There is, therefore, no conflict between the TRIA and the Treaty.

Moreover, even assuming, arguendo, that there were a conflict between the two, the TRIA would have to be read to abrogate that portion of the Treaty. Although a "'treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed,'" Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 252 (1984) (quoting Cook v. United States,

288 U.S. 102, 120 (1933)), Section 201(a) of the TRIA expressly states that it permits attachment of the assets of a foreign sovereign's instrumentalities in satisfaction of a terrorism-related judgment against the foreign sovereign "[n]otwithstanding any other provision of law" (emphasis supplied).  See Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993) (noting that the Courts of Appeals have regularly interpreted such "notwithstanding" provisions "to supersede all other laws"); see also Ministry of Defense and Support for the Armed Forces of the Islamic Rep. of Iran v. Elahi, 129 S. Ct. 1732 (2009); Hill v. Rep. of Iraq, No. 99 CV 03346TP, 2003 WL 21057173, at *2, 2003 U.S. Dist. LEXIS 3725, at *10-11 (D.D.C. Mar. 11, 2003) (holding that the "notwithstanding provision" is "unambiguous and effectively supersedes all previous laws").

D.   TAKINGS CLAUSE

In the next of the arguments raised below, Bank Melli argues that the attachment here in issue constitutes a per se taking of physical property, not for a public purpose and without just compensation, and therefore offends the Takings Clause of the Fifth Amendment of the U.S. Constitution, as well as Article IV.2 of the Treaty of Amity.  See U.S. Const., amend V ("nor shall private property be taken for public use, without just compensation"); Treaty, art. IV.2 (property of Iranian companies

"shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation").

The argument is without merit. Bank Melli was added to the OFAC list because of its unlawful actions in support of terrorism. In so doing, it had clear notice from the TRIA, enacted five years earlier, that such actions could result in the designation and blocking of its assets under the TRIA, which could in turn subject them to attachment. See Paradissiotis v. United States, 304 F.3d 1271, 1275-76 (Fed. Cir. 2002) (rejecting a takings clause claim that OFAC's freezing of the plaintiff's stock options, which eventually became valueless, constituted a taking without just compensation); see also Branch v. United States, 69 F.3d 1571, 1576 (Fed. Cir. 1995) (noting that seizure of assets to offset tax liability or pay a civil penalty would not constitute a taking).

Here, where the underlying judgment against Iran has not been challenged, seizure of Bank Melli's property, as an instrumentality of Iran, in satisfaction of that liability does not constitute a "taking" under the Takings Clause. See Branch, 69 F.3d at 1577 (noting absence of "any principle of takings law under which an imposition of liability is deemed a per se taking as to any party that cannot pay it"). Instead, Bank Melli's own conduct as a funder of weapons of mass destruction opened it to liability for judgments already entered against Iran. See, e.g.,

Meriden Trust and Safe Deposit Co. v. FDIC, 62 F.3d 449, 455 (2d Cir. 1995) (citing cases holding that deprivation of property resulting from voluntary conduct cannot constitute a "taking").

As the Supreme Court has noted, the Takings Clause is designed "to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" E. Enters. v. Apfel, 524 U.S. 498, 522 (1998) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)). Here, where Bank Melli's assets are subject to attachment to satisfy a judgment against its foreign sovereign, the underlying purpose of the Takings Clause is in no way violated by attachment of Bank Melli's assets.

Finally, Bank Melli does not advance any argument to find that the Takings Clause in the Treaty of Amity would require a different analysis. Cf. Kahn Lucas Lancaster v. Lark Int'l, 186 F.3d 210, 215 (2d Cir. 1999) (treaties are construed in much the same manner as statutes and district court interpretations are subject to de novo review).

E.   ALGIERS ACCORDS

In the last of the arguments it raised below, Bank Melli argues that the attachment here in issue violates the so-called Algiers Accords (the "Accords"). In 1980, the United States and Iran, under the auspices of the Government of Algeria, entered into the Accords to settle a number of a disputes between the two

-23-

countries, in particular, matters arising out of the hostage crisis that occurred on November 4, 1979 in Tehran in which the Iranian Government seized the U.S. Embassy and held captive 52 U.S. citizens.[7]  Previously, in response to the hostage crisis, President Carter had issued Executive Order 12,170, which "blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States . . . ."  Exec. Order 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979).  As part of the Accords, the United States agreed to "restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979," and to "commit[] itself to ensure the mobility and free transfer of all Iranian assets within its jurisdiction."  20 I.L.M. at 224.  The United States also agreed, subject to some exceptions to "arrange, subject to the provisions of U.S. law applicable prior to November 14, 1979, for the transfer to Iran

---

[7] The Accords are comprised primarily of two documents: the Declaration of the Government of the Democratic and Popular Republic of Algeria (Jan. 19, 1981), and The Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran (Jan. 19, 1981), reprinted in 20 I.L.M. 223 (1981); 81 Dep't of State Bull. No. 2047, Feb. 1981 at 1.  See Iran Aircraft Industries v. Avco Corp., 980 F.2d 141, 143 (2d Cir. 1992).

of all Iranian properties which are located in the United States and abroad." Id. at 227.

Bank Melli argues that, because the obligations of the United States under the Accords are ongoing, and the Forest Hills property at issue was owned by Bank Melli prior to November 14, 1979 (making it a blocked asset under Executive Order 12,170) the property is subject to these ongoing Accords and therefore the subsequent "blocking" of the asset under Executive Order 13,382 violated the Accords.

This argument confuses the United States's obligation to unblock assets that had been blocked based on pre-Accords violations with post-Accords blocking based on post-Accords violations. As the district court noted in an earlier decision, after the United States and Iran entered into the Accords most Iranian assets were automatically unblocked. See Weinstein, 299 F. Supp. 2d at 67-68. Since the Forest Hills property was no longer blocked after the Accords, Bank Melli was entitled to exercise any and all rights of ownership, including sale of the property, until it was subsequently blocked on October 25, 2007. Although Bank Melli argues that no specific expiration date was given in the Accords, and therefore the obligations of the U.S. are ongoing, nothing in the Accords suggests that the United States is precluded from blocking Iranian assets based on subsequent events unrelated to the hostage crisis. Indeed, the

United States has implemented several sanctions programs against Iran, subsequent to the Accords, that have had the effect of limiting the mobility of Iranian property. See, e.g., Executive Order 12,613, 52 Fed. Reg. 41940 (Oct. 29, 1987) (prohibiting, pursuant to 3 U.S.C. § 301 and Section 505 of the International Security and Development Cooperation Act of 1985, 22 U.S.C. § 2349aa-9, certain Iranian imports); see also Weinstein, 299 F. Supp. 2d at 68 (providing overview of executive orders imposing sanctions that affected property controlled or owned by Iran).

Nor is Roeder v. Islamic Rep. of Iran, 333 F.3d 228 (D.C. Cir. 2003), upon which Bank Melli heavily relies, to the contrary. In Roeder, the D.C. Circuit found that, despite a Congressional amendment to the FSIA specifically intended to abrogate Iran's sovereign immunity for that particular case, plaintiff's action was still nevertheless barred because it was based on the events of the November 4, 1979 hostage crisis and the Accords "bar[red] and preclude[d] the prosecution against Iran of any pending or future claim of . . . a United States national arising out of the events" of the seizure and detention of the 52 U.S. citizens. Id. at 236 (internal quotation marks omitted). It concluded that the specific amendment to the FSIA in no way addressed the Accords and, given the express statement in the Accords barring such actions, refused to interpret the amendment to the FSIA, despite its being passed specifically to

permit plaintiffs to go forward with their case, as abrogating or modifying that agreement without an express statement from Congress to that effect. Id. at 237-38. While the Accords prevent suits arising out the hostage crisis, the language regarding Iranian assets in no way suggests that Iranian assets would be immunized from blocking for all time. The blocking of assets undertaken by President Carter in his Executive Order was done in response to the particular events of November 1979, and the Accords unblocked those assets. Since nothing in the Accords suggests that the United States has a limitless obligation to ensure that Iranian assets remain free from attachment based on events unrelated to the 1979 hostage crisis, Bank Melli's arguments that blocking its assets and subsequent attachment of those assets would violate the Accords are simply unavailing.

CONCLUSION

The Court has considered Bank Melli's other arguments and finds them without merit. Accordingly, for the foregoing reasons, the Court affirms the district court's decision to grant plaintiff's motion and appoint a receiver to attach Bank Melli's property in partial satisfaction of the judgment against Iran and to deny Bank Melli's motion to dismiss.